**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **JOHN M. DUBOSE, SR.** | § | **PLAINTIFF** |
| | § | |
| **v.** | § | **CAUSE NO 1:05CV503** |
| | § | |
| **ROBERT E. BROOKS, ORACLE GAS,** | § | |
| **L.L.C., AND DELPHI DRILLING, L.L.C.** | § | **DEFENDANTS** |

**MEMORANDUM OPINION AND ORDER GRANTING**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

THE MATTER BEFORE THE COURT is the Motion for Summary Judgment [43] filed by Defendants Robert E. Brooks ("Brooks"), Oracle Gas, L.L.C. ("Oracle") and Delphi Drilling, L.L.C. ("Delphi") (collectively, the "Defendants"). The Plaintiff has filed his response to the Motion, and the Defendants have replied. After due consideration of the submissions and the relevant law, it is the Court's opinion that Defendants have shown that they are entitled to judgment as a matter of law in this breach of contract action.

DISCUSSION

This case involves a contract between Plaintiff John M. Dubose, Sr. ("Dubose") and Defendant Brooks in which Dubose promised to perform services for Brooks in furtherance of Brooks's oil and gas business, conducted under the names of Oracle and Delphi. According to Dubose, in exchange for his knowledge and expertise in the oil business, Brooks promised to employ him until he retired. In addition he was promised Debose an assignment of 5% of all production out of the Pistol Ridge Field regardless of when it occurred and free from any costs. Dubose quit his former business arrangement in order to enter into this relationship with Brooks. (Exh. "I" to Def. Memo in Supp. Mtn. Summ. Judg.). The Amended Complaint does not specify when their agreement was consummated, but Dubose testified in his deposition that the

agreement "[took] place in my living room in 2002 between Mr. Brooks and me."  (Exh "L" to Pl. Resp., pg. 11).

The parties went forward under this oral arrangement.  Dubose "encouraged [mineral interest owners] to make leases which ultimately were taken in the name of Oracle Gas, L.L.C," "negotiated ... the purchase of [oil field equipment]," and "helped acquire the pipeline rights for distributing production from the Pistol Ridge field."  (Exh. "E" to Pl. Resp., pgs. 2-3).  Delphi Drilling, under the direction of Brooks, began drilling operations in the field.

On September 29, 2003, Brooks wrote a letter to Dubose in which he noted that drilling costs had been exceptionally high.  (Exh. "B" to Def. Memo in Supp. Mtn. Summ. Judg.).  Brooks set out changes he intended to make "immediately;" which included a number of terminations and reassignments of personnel.  As to Dubose's role, Brooks wrote:

> Your job going forward will be focused on consulting.  I would like you to consult on completions, the "big rig" build, finishing the work-over rig, cement unit, rig repairs, down hole issues such as fishing and squeezing, milling, etc.  You will report to me and I will require daily reports on progress on all activity and projects.
>
> Your compensation will be either $300/day or $6,000/month.  You decide.  If you take the salary you will be eligible for health insurance.  You will also receive a 5% carried working interest in Pistol Ridge so long as you are affiliated with Delphi Oil.  You will retain your interest in those wells that are drilled or reentered during your affiliation only.

*Id.*

In regard to this letter, Dubose testified:

Q.    All right.  In the last paragraph it says, "Your compensation will be $300 a day or $6,000 a month.  You decide.  If you take the salary you will be eligible for health insurance."  What did you decide to do?

A.    I told Bob I'd take the 6,000.  I already had 5 percent carried.

. . .

Q.      "You will also receive a 5 percent carried working interest in Pistol Ridge so long
        as you are affiliated with Delphi Oil."

A.      Yeah.  That's when he changed the deal to "affiliated."  The original deal had
        nothing to do with that.

Q.      This is the first time you heard of that.

A.      Right.

Q.      Did you object to this?

A.      Well, that's what I talked to him at Prentiss about.  I told him, I said, "This says,
        'as long as I'm affiliated.'"  He said, "You're going to be here, John.  Don't worry
        about it."

                                        . . .

A.      No, I didn't object to it.  He said, Don't worry about it.  So I took him at his word.
        He always said he was a man of his word.

(Exh. "L" to Pl. Resp., pgs. 20-21)

In June 2004, Brooks sent prepared assignment forms to Dubose for two producing wells
completed during Dubose's employment.  (Exh. "E" to Def. Memo in Supp. Mtn. Summ. Judg.).
The assignments gave Dubose a five percent working interest in the wells.  *Id.*  Dubose executed
the assignments and sent them back to Brooks at Delphi.  (Exh. "L" to Pl. Resp., pgs. 25-27).
The assignments specified that the interest was "free and clear of all drilling, re-entry and
completion costs to the point of tanks and/or metering stations" but subject to costs incurred after
that point.  (Exh. "L" to Pl. Resp., pg. 31).  Dubose testified that he signed these assignments
knowing that they did not conform to the deal he thought he had with Brooks:

Q.      Did you understand you were going to have to pay costs associated with
        the operations?

A.    Well, the original agreement wasn't like that, but this agreement was.  So I signed it and sent it back to them.  I didn't have no choice.

Q.    Your recollection of the original agreement was that you were never going to have to pay any costs; right?

A.    He said 5 percent carried.  Now, you figure it out.

Q.    My question is: What do you recall about the original agreement?  It was free of all costs?

A.    Yes, sir.

Q.    But here in June of 2004, you signed a document that was filed at the courthouse in which you agreed to pay costs, did you not?

A.    I had no choice.

. . .

Q.    Did you tell Mr. Brooks that this wasn't the deal, that you weren't supposed to pay any costs?

A.    Mr. Brooks knew this wasn't the deal.

Q.    Did you tell Mr. Brooks this wasn't the deal, that you weren't supposed to pay costs?

A.    No, sir, I did not.

. . .

Q.    And you cashed those checks that were sent to you, did you not?

A.    Yes, sir.

Q.    Did you ever, when you got those checks, call Mr. Brooks and say, Why are you deducting cost from my revenue?

A.    No, sir.

*Id.*, pgs. 32-34.

Three months later, on September 23, 2004, Brooks met with Dubose and informed him

-4-

his employment was being terminated effective September 24, 2004.  (Exh. "F" to Def. Memo in Supp. Mtn. Summ. Judg., pg. 2).  Brooks also provided a letter dated the same date setting out the terms of Dubose's termination.  *Id.*, pg. 1.  Dubose received one month severance pay, and Delphi agreed to pay COBRA health insurance payments for eight months - until Dubose reached age 65 and was eligible for Medicare.  *Id.*  The letter also advised Dubose that he would retain the previously assigned interest in the two producing Pistol Ridge field wells.  *Id.*

PLAINTIFF'S CLAIMS:

Dubose seeks to enforce the agreement as he understood it to be at the time he initially joined Brooks's drilling operation.  He claims a right to a 5% interest in all wells drilled by Brooks in the Pistol Ridge field, free of any costs; unpaid salary, bonuses and day rates from his termination to present day; and an accounting and reimbursement for the costs deducted from his production payments.  This is Dubose's understanding of what he was entitled to under the original agreement, with the addition of Brooks's subsequent "promise" that Dubose would have his job until retirement.

It is long-established law in Mississippi that antecedent parol agreements are merged into a written contract, provided that the terms of the written contract are unambiguous.  *McMinnis v. Manning*, 95 So. 250 (Miss. 1923); *Winter & Co. v. Windham*, 80 So.2d 832 (Miss. 1955).  In examining the series of events here, it appears that the original oral agreement was merged into subsequent written agreements.  The first written agreement was the letter dated September 29, 2003, which changed the terms of Dubose's employment from those in the oral agreement.  These terms were accepted when Dubose continued his employment with Brooks's drilling operations.  *See Edwards v. Wurster Oil Co., Inc.*, 688 So.2d 772 (Miss. 1997)(Acceptance can

-5-

be inferred from offeree's actions).  Next, the written assignment form changed Dubose's interest in the Pistol Range field from "5% carried working interest"  to "5% carried to the tank working interest."  Dubose accepted this modification by executing the assignment form as it was presented to him.

Dubose's testimony was that he knew the written documents presented to him did not conform to his understanding of his deal with Brooks.  Yet, he did nothing to ensure that the written documents reflected the agreement he now seeks to enforce.  The time for him to reconcile the discrepancies was before he continued to work for Brooks in October 2003 and before he executed the assignment forms.  "Mississippi law creates a duty on contracting parties to read their contracts, and imputes the knowledge of that contract to the parties.  Once signed, the written terms of the contract control."  *Anderson v. Equitable Life Assur. Soc. of the U.S.*, 248 F.Supp.2d 584, 590 (S.D. Miss. 2003).  "To permit a party when sued on a written contract, to admit that he signed it but to deny that it expresses the agreement he made or to allow him to admit that he signed it but did not read it or know its stipulations would absolutely destroy the value of all contracts." *Turner v. Terry,* 799 So.2d 25, 33 (Miss. 2001) (quoting *Busching v.Griffin*, 542 So.2d 860, 866 (Miss.1989)).

It is a question of law for the Court to determine whether a contract is ambiguous and, if not, enforce the contract as written.  *Miss. Transp. Comm'n v. Ronald Adams Contractor, Inc.*, 753 So.2d 1077, 1087 (Miss. 2000).  The Court finds that the terms of Dubose's employment contract are not ambiguous.  Those terms are as stated in the September 29, 2003 letter and modified by the assignment forms.

CONCLUSION

Dubose's claims in this lawsuit are entirely predicated on the enforceability of the original oral agreement.  However, any oral agreement merged into the written documents, which together formed an unambiguous contract.  Dubose therefore cannot enforce the terms of the original oral agreement, whatever those might have been.  Defendants are entitled to judgment as a matter of law as to Dubose's claims, and summary judgment will be granted.

**IT IS THEREFORE ORDERED AND ADJUDGED** that the Motion for Summary Judgment [43] filed by Defendants Robert E. Brooks, Oracle Gas, L.L.C. and Delphi Drilling, L.L.C. is **GRANTED**.  Plaintiff's claims against the Defendants are **DISMISSED WITH PREJUDICE.**

**SO ORDERED AND ADJUDGED** this the 1ᵗʰ day of December, 2006.

s/ *Louis Guirola, Jr.*

LOUIS GUIROLA, JR.
UNITED STATES DISTRICT JUDGE